[Civ. No. 9366.   Third Dist.   Dec. 24, 1958.]

JOSEPH KEJR, Respondent, v. NATURAL RESOURCES, INC. (a Corporation) et al., Defendants; MENDOCINO LOGGING COMPANY (a Corporation) et al., Appellants.

Darling, Shattuck & Edmonds and Donald K. Hall for Appellants.

David B. Fyfe for Respondent.

VAN DYKE, P. J. — Plaintiff-respondent brought this action against defendant-appellant Mendocino Logging Company and defendant-appellant Construction Engineers, In-

corporated, to quiet title to 40 acres of timber land in Mendocino County. The appeal is from a judgment decreeing that plaintiff is the owner of the property and quieting his title thereto. The complaint is in the usual brief form of an action to quiet title. Appellants' answers denied the allegations of plaintiff's ownership and affirmatively pleaded that they owned the timber on the land.

On September 27, 1948, six people, four of whom bore the name "Hopkins" and two of whom bore the name "Raderchak," and all of whom were related, were the owners of the subject property. We shall refer to this group as "Hopkins." On that day, and simultaneously, they executed two documents with O. O. Barker. One was a quitclaim deed and the other was a document called a holding agreement. The deed contained a statement that the interest thereby conveyed was subject to the holding agreement. The deed was recorded. The holding agreement was not. The trial court found on sufficient evidence that appellant Construction Engineers, Inc., had both actual and constructive notice of the existence and contents of the holding agreement at the time it now claims to have acquired title to the timber on the property by a contract of sale from Barker. Construction Engineers, Inc., later assigned its interest in the timber to appellant Mendocino Logging Company which, as the court found, also took with notice of the holding agreement.

The holding agreement begins by reciting that the parties have a mutual interest in the 40 acres described therein, and then continues to state the following: That it is desirable "that no transfer of any interest which each of us may hold in the property be transferred or assigned without the mutual consent of all," including Barker; that Barker is to act as the representative of Hopkins in the performance of certain things which by the agreement he agrees to perform; that Barker is to accept a transfer of the property to him by deed and is to hold the transfer and deed for the following uses and purposes: (a) In his discretion to bring a suit to quiet title if needed, (b) If necessary, to engage the services of a surveyor to survey and cruise the land in order that he may be "in a position to effectively negotiate either resale of the premises, or if he deems it more desirable, agreements for sale of timber only without conveying the lands," (c) To advance necessary expenses for surveys, quiet title actions or in any other manner other than by action, and to prorate to each of the owners the

expenses thereof, (d) As remuneration, Barker was to receive 10 per cent of the revenue resulting either from a sale or from income derived from any contract for the sale of the timber which he might make. It is stated that Barker, by written acceptance of the agreement became obligated ''to carry forth the purposes of this holding agreement for the joint and mutual interests of all of the parties.'' For the holding agreement the parties used a printed form on which the property description was filled in. It was in evidence that the form was commonly used by Barker along with quitclaim deeds in aggregating small timber holdings for the purpose of being able to offer large tracts of timber for sale. Barker purported to sell the timber on some 7,000 acres of land of which the 40 acres, the subject of this action, was a part. The consent of Hopkins to the contract of sale was not obtained.

It is appellants' primary contention that Barker had power not only to negotiate for a sale of the timber, but to sell and transfer the same and bind Hopkins by his acts.

After a time, five of the Hopkins group conveyed their interests in the 40 acres to plaintiff. During the trial Barker quitclaimed such interest in the land and timber as he might have to plaintiff. The decree quieted plaintiff's title to an undivided five-sixths interest in the land and timber thereon.

It appears that Barker was a licensed real estate broker whose principal business was negotiating sales of timber lands to logging companies. His method of operation was to have owners quitclaim their property to him subject to holding agreements similar to the holding agreement executed between himself and Hopkins. He would then endeavor to sell the timber or the land in large blocks rather than in the smaller units covered by the individual transactions between himself and small owners. When representatives of Construction Engineers, Inc., were negotiating with Barker for the purchase of the timber on the 7,000 acres covered by the contract later executed by Barker, they had before them many of these holding agreements and in many instances used them for the purpose of describing parcels of the lands included in the contract with Barker. It appears also that Barker told them of the existence of the holding agreements and some reference was made in the contract between Construction Engineers, Inc., and Barker to the effect that some of the lands were under holding agreements.

When the quitclaim deed and the holding agreement are construed together, as they must be, as though they were one

document, it becomes apparent at once that the holding agreement placed limitations upon the title purportedly conveyed by the deed to Barker and upon his power to deal with the land and timber. It is equally apparent that the two documents are ambiguous and uncertain as to just what title and powers Barker had. Considerable evidence concerning the negotiations between the parties was introduced. ■ As said in *Universal Sales Corp., Ltd.* v. *California Press Mfg. Co.*, 20 Cal.2d 751, 761 [128 P.2d 665]:

"As an aid in discovering the all-important element of intent of the parties to the contract, the trial court may look to the circumstances surrounding the making of the agreement . . ., including the object, nature and subject matter of the writing . . ., and the preliminary negotiations between the parties . . ., and thus place itself in the same situation in which the parties found themselves at the time of contracting."

■ With the instruments and the evidence before it, the trial court determined that Barker was given no power to bind Hopkins by any contract he might make concerning the property or the timber, except as they, in some effective way, consented thereto. The record amply supports this determination of the trial court. Although as a part of the transaction between them the Hopkins group gave to Barker a quitclaim deed, they tied that deed to the holding agreement by apt reference. It is expressly stated therein that no transfer of any interest which the parties hold in the property can be transferred or assigned without the mutual consent of all. If there be any ambiguity in this provision as one limiting the title and the power of Barker, the trial court was fully authorized in interpreting the contract as denying to him any power to transfer or assign any interest in the property without Hopkins' consent. We think it unnecessary to labor the point and we uphold the conclusion of the trial court that, to the actual as well as to the constructive knowledge of appellants, Barker's attempt, if it was in fact that, to contract away the right to the timber without the consent of Hopkins was nugatory and that by the execution of that agreement by Barker, without such consent no interest in the property passed.

■ Appellants also contend that Hopkins consented to the sale of the timber. They argue as follows: Barker first sold the property to Hopkins in 1947. In 1948 he received the

quitclaim deed and the holding agreement. Much correspondence was exchanged between him and Hopkins concerning disposition of the property. On December 27, 1949, one of the Hopkins group wrote to Barker complaining that Barker was slow in putting the property on the market and was quoting an inadequate price. The writer said: "That you are fully within the rights granted you is a fact of which we are well aware. However, we are hard put to reconcile some of your past statements with the price you have put upon our land. Upon two separate occasions you assured us that the timber would be on its way to market. . . . The power of sale that you have gives you leave to exercise your judgment regarding the best deal for us. We do not dispute your judgment, we merely would like to know the basis for it." The letter, say appellants, was a recognition of Barker's authority to sell or at least evidences a consent. Only one person was writing and it was not shown he had authority to speak for all; and what was said was in conflict with the language of the holding agreement and the oral testimony. It was for the trial court to draw or not to draw the inferences argued for by appellants.

█ Appellants claim ratification of the contract of sale. They argue that on December 27, 1949, Barker advised Hopkins that he was negotiating a deal with Construction Engineers, Inc.; that eight days later the contract was signed; that in January following Barker published, in a periodical he disseminated and to which Hopkins subscribed, a statement that he had sold the 7,000 acres of timber under a contract which included the Hopkins' timber; that like publications were made later; that not until 1955 did they deed their land to respondent; that in the interim they made no objection to the contract of sale. Appellants say that by their conduct they acquiesced in Barker's acts and could no longer deny his authority. They invoke the rule stated in *Gates* v. *Bank of America,* 120 Cal.App.2d 571, 576-577 [261 P.2d 545], that where the rights of third persons depend on his election a principal must disaffirm an unauthorized act of his agent within a reasonable time after acquiring knowledge thereof, else his silence may be deemed ratification or acquiescence in order to protect an unsuspecting third party. The statement of the rule demonstrates its inapplicability to this case. Among other things, there were no unsuspecting third parties. Appellants knew Barker was unauthorized. At most, the plea of ratifi-

cation or acquiescence and the supporting evidence posed an issue of fact for the trial court which that court resolved against appellants.

The judgment appealed from is affirmed.

Peek, J., and Schottky, J., concurred.